UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

SONNY DAVIS,

        Plaintiff,

           v.                    CAUSE NO. 3:17-CV-729-RLM-MGG

TAYLOR, et al.,

        Defendants.

<u>OPINION AND ORDER</u>

Sonny M. Davis, a prisoner without a lawyer, was granted leave to proceed on a claim against Eddie Taylor, Dr. Barbara Eichman, and Michelle Boren[1] for denying him mental health treatment in violation of the Eighth Amendment. He was also granted leave to proceed against these defendants on an injunctive relief claim to obtain mental health treatment, as required by the Eighth Amendment. The defendants have filed a motion for summary judgment. Mr. Davis received a notice, as required by N.D. Ind. L.R. 56-1(f), notifying him of the consequences of failing to respond to the defendants' motion. Mr. Davis did not file a response. The summary judgment motion is now ripe for decision.

## I.    FACTS

Mr. Davis has been incarcerated since 2006. He was housed at Pendleton Correctional Facility until April 2015, when he was transferred to Westville

---

[1] Michelle Boren's last name is spelled as Bourn in Mr. Davis's amended complaint.

Correctional Facility. He has been in segregation the majority of the time he has been incarcerated.

The events relevant to this case took place between April 15, 2015 and December 2017. This opinion recounts them in the order in which they happened.

*April 2015.* Several days before his transfer to Westville, Mr. Davis was evaluated by Dr. Roger Perry at Pendleton to assess his behavioral and mental health following a suicide threat. Dr. Perry's evaluation indicated that Mr. Davis suffered from antisocial personality disorder ("ASPD")[2] and had a history of threatening self-harm if his demands weren't met. He also had a history of possible depressive symptoms, but his Prozac prescription had been discontinued because he refused to take the medication. Dr. Perry noted that Mr. Davis was alert, well-oriented, calm, cooperative, appropriately social, and had not reported any depressive symptoms. Mr. Davis denied any suicidal ideation or intent and he was working on developing coping skills to manage his explosive aggressive outbursts. Mr. Davis had recently received a conduct report for altering his television to use as a cell phone charger. Dr. Perry released Mr. Davis from suicide watch.

---

[2] ASPD is a mental health condition in which a person consistently shows no regard for right and wrong and also ignores the rights and feelings of others. Individuals who suffer from ASPD tend to antagonize, manipulate, or treat others more harshly, and may be aggressive or violent. They typically show no guilt or remorse for their behavior, often violate the law, and fail to sustain consistent work. These individuals may also lack restraint, lie, behave violently or impulsively, and have problems with drug and alcohol use. There is no medication that specifically treats ASPD, but medications for symptoms associated with ASPD, including anxiety and depression, may be prescribed. Psychotherapy can be used for ASPD symptoms and typically involves anger and violence management.

At Westville, Mr. Davis received a medical clearance for segregated housing. Mr. Davis's medical records from Pendleton indicated he had been diagnosed with chronic ASPD and had a history of refusing medical treatment and medication, trying to direct his own care, and disagreeing with medical professionals on his care. His records also showed that he was manipulative, demanding, concealed and trafficked medication, threatened staff, and received a number of conduct reports. The records documented that Mr. Davis's prescribed medications were discontinued on December 31, 2014, because he was noncompliant in taking them.

*August 2015*. Charles Dalrymple, a mental health professional, evaluated Mr. Davis. Mr. Davis asked for mental health medication and threatened to harm himself if he didn't get the medication. Mr. Davis's noncompliance with taking medications and his drug-trafficking charges at Pendleton were discussed. Mr. Davis said that, in his opinion, his medications were discontinued because he had personal conflicts with Pendleton's administration. Mr. Dalrymple noted that Mr. Davis's explanation was consistent with his diagnosis of ASPD.

*September 2015*. Dr. Barbara Eichman, a psychiatrist evaluated Mr. Davis. He expressed no suicidal ideation, nor did he exhibit signs that he intended to harm himself. Mr. Davis's appearance, behavior, affect, mood, and attitude were appropriate and normal. He exhibited no signs of psychosis or mania. Dr. Eichman assessed his reasoning, impulse control, and judgment as "fair." She noted he had a history of trafficking cell phones and drugs while he was in the segregation unit at Pendleton. Dr. Eichman prescribed Prozac for his

3

panic attacks and noted that despite his history of noncompliance with Prozac, she believed a trial of Prozac was clinically indicated to see if Mr. Davis would have some relief from his reported symptoms. Two weeks later, on September 21, 2015, Mr. Davis had a mental health treatment plan review. Medical records indicate he was taking Zantac and Prozac and he was stable on those medications.

*October 2015.* Mr. Davis was treated on three occasions. First, he was seen for an unscheduled nursing visit because he requested a change in his medications. He denied having any suicidal ideation or desire to harm others and was referred for a behavioral health evaluation. A few days later, Mr. Dalrymple evaluated Mr. Davis because he was complaining of having anxiety symptoms despite taking his prescribed medications. He asked for information on astrology, yoga, and meditation, and Mr. Dalrymple agreed to look into getting it. Mr. Davis told Mr. Dalrymple that his segregated classification was psychologically detrimental to him. Mr. Dalrymple informed him that his segregation status was an IDOC policy issue. He diagnosed Mr. Davis with ASPD. A few days after that, Dr. Eichman reviewed Mr. Davis's chart and increased his dosage of his Prozac to address his reported symptoms.

*November 2015.* Dr. Eichman saw Mr. Davis in response to his complaints of feeling more anxious. Mr. Davis requested a prescription of Geodon, an anti-psychotic medication, that he had been given at an earlier facility. Dr. Eichman noted that Geodon was most likely discontinued at Pendleton because Mr. Davis's clinical presentation wasn't consistent with his reported symptoms. She

determined that a trial of Geodon, contingent on his compliance, was reasonable to see if Mr. Davis would experience some relief from his symptoms. Dr. Eichman diagnosed Mr. Davis with ASPD.

*December 2015.* Mental health staff met with Mr. Davis because he had an altercation with custody staff over his dissatisfaction with not being given a gluten free meal tray. Mr. Davis told the mental health staff that he was "going to take his boxers off and hang himself." He was placed on suicide watch and refused his medications and assessments.

Kimberlee Koehler, a mental health professional, met with who was on suicide watch. Mr. Davis said he was "ready to get out of here." He was agitated about administrative issues and angry about not being given a gluten free meal tray. He had also broken the sprinkler in his cell and had stolen pepper spray from a custody officer. Mr. Davis threatened to hang himself with his boxers if he wasn't allowed to speak to higher level custody staff. Ms. Koehler told Mr. Davis that the supervising officer would address his concerns about having gluten free meal trays. Mr. Davis refused to have allergy lab tests done to assess his need for a gluten free diet.

After her meeting with Mr. Davis, Ms. Koehler consulted with Dr. Eddie Taylor, who was the lead psychologist at Westville and oversaw the mental health program and mental health professionals, about Mr. Davis's altercation with custody staff about not being given a gluten free tray and her assessment of his condition. After reviewing the situation, Dr. Taylor recommended that Mr. Davis remain on suicide watch and be reevaluated in 24 hours.

Mr. Davis was released from suicide monitoring. He admitted his suicide threat was related to his frustration over being denied a gluten free meal tray. Mr. Davis asked that he be given a specific diagnosis so that he could be released from segregated housing. The next day, Dr. Eichman ordered Mr. Davis's medications to be discontinued because he had refused ten of his last 20 doses of medication.

*January 2016.* Ms. Koehler met with Drs. Eichman and Taylor to discuss Mr. Davis's request for a specific diagnosis—an Axis 1 diagnosis—such as depression so that he could be prescribed medications and released from segregated housing. Dr. Eichman indicated Mr. Davis's diagnosis was ASPD, there was no medication that specifically treated ASPD, and there was no basis for changing his diagnosis or prescribing further medications. She explained that Mr. Davis had been prescribed the medications he requested but they didn't change his behavior or alleviate his symptoms. Dr. Eichman discontinued Mr. Davis's medications because they weren't clinically indicated based on his diagnosis, his observed behaviors, and his medical record. Dr. Taylor didn't have the authority to prescribe or order medication. In sum, Dr. Eichman concluded that Mr. Davis's noncompliance with his medications, altercations with custody staff, threatening behavior toward staff, threats of self-harm if others did not comply with his wishes, manipulation, destruction of property, and overt violations of prison rules were consistent with a diagnosis of ASPD.

*February 2016.* Dr. Eichman entered a note in Mr. Davis's medical chart stating he refused a visit with her and his medications were discontinued due to

his noncompliance. His January 2016 medication administration record showed he was no longer being prescribed Prozac and Geodon. While Mr. Davis reported he would like to have his medications reinstated, he didn't report any withdrawal symptoms when he stopped taking Prozac and Geodon. Later that month, Ms. Koehler noted Mr. Davis didn't report any mental health concerns and hadn't repeated his suicide ideations. She noted he had refused to see his psychiatrist.

*March 2016.* Mr. Dalrymple met with Mr. Davis at his cell to assess his behavioral health. Mr. Davis was offered an out of cell visit, but he refused. Mr. Davis was awake, alert and there were no abnormalities observed or reported. Mr. Dalrymple reviewed Mr. Davis's mental health treatment plan and noted that his symptoms were consistent with a diagnosis of ASPD. He recommended that mental health staff continue to monitor Mr. Davis while he was in restricted housing and told Mr. Davis to submit a heath care request if he required treatment.

About a week later, Mr. Davis once again refused to attend a psychiatric appointment with Dr. Eichman. She noted that Mr. Davis's appointment would not be rescheduled.

*April 2016.* Mr. Dalrymple met with Mr. Davis to assess his behavioral health. Mr. Davis refused an out of cell visit, but his mental health assessment was within normal limits and he had no specific requests for mental health care. Medical records indicate that he didn't have an Axis 1 mental health diagnosis and hadn't been on medications since December 30, 2015.

*June 2016.* Mr. Davis underwent another behavioral health assessment. Mr. Dalrymple reviewed Mr. Davis's mental health treatment goals and noted his reported anxiety symptoms weren't impairing his daily functioning. As such, the goal of reducing anxiety was discontinued. Mr. Davis also no longer reported depressive symptoms because they had been addressed by his positive coping skills. Although it was noted that he repeatedly refused out of cell visits with his mental health professionals and rarely spoke to them, he appeared to be stable in restricted housing.

*July 2016*, Mr. Davis was treated on four occasions. First, Mr. Davis was seen for a behavioral health assessment. He again refused an out of cell visit and made no specific requests about his mental health. His mental status exam was essentially normal. Second, medical staff examined Mr. Davis because he was seen inserting a cell phone and charger into his anus. He reported that nothing was wrong and refused care. He later agreed to be transported by ambulance to the emergency room. When Mr. Davis returned from the hospital, he was placed in a restricted holding cell where he refused medical treatment. On the third occasion, Mr. Davis again refused medical treatment. The next day, during a mental health visit, Mr. Davis inquired as to when he could return to his cell and refused medical treatment.

*August-October 2016.* A mental health professional met with Mr. Davis four times to assess his behavioral health. He continued to refuse out of cell visits, but he didn't voice any complaints.

*November 2016*. Mr. Davis underwent three behavioral health assessments. First, he refused an out of cell visit, said he wasn't getting gluten free meal trays, and demanded he be released from restrictive housing. On A few days later, Mr. Davis indicated he might be willing to have an out of cell visit and was told that such a session was available, if he had a specific request. A week after that, he again refused an out of cell visit, but he didn't voice any complaints.

*December 2016--January 2017*. Mr. Davis had four more behavioral health assessments. First, Ms. Dana Mizgate observed Mr. Davis and noted that he was hostile, demanding, and defensive. He was verbally aggressive toward her and demanded he be allowed to see custody officers. When she didn't respond in the way he wanted, Mr. Davis asked "[D]o I have to say I'm suicidal to get custody up here?" Two weeks later, Mr. Davis submitted a health care request stating he would now like to participate in out of cell mental health evaluations. Mr. Davis was told that he would be placed on the list for out of cell meetings. Two weeks later and again a week after that, Ms. Mizgate met with him at his cell and noted his mental status exam was within normal limits. Ms. Mizgate tried to meet with Mr. Davis the following week, but she couldn't do so because he had been removed from his cell for breaking the shower head. She noted she would follow-up with him the following week.

*February--May 2017*. Mr. Davis was seen for behavioral health assessments five times between the beginning of February and the middle of May. Mr. Davis's mental health exam was within normal limits at each visit, and he voiced no complaints.

*May–June 2017.* Michelle Boren, a mental health professional, completed behavior health assessments of Mr. Davis twice in this span. The first time, she noted there was nothing remarkable about his condition and told him to submit a request form if he required mental health services. The second time Ms. Boren met with Mr. Davis to discuss his treatment plan and goals. Mr. Davis told Ms. Boren that he struggled with not being able to control his feelings and pushed his family away because he couldn't deal with them. They discussed different ways to address his anger and how to prevent others from controlling his feelings. She told Mr. Davis that she would provide him with a "thinking patterns worksheet." He appeared to be receptive to working on a number of issues but struggled with being able to cope with certain concepts. Ms. Boren noted that Mr. Davis was compliant with his treatment plan, but had a history of trafficking cell phones and drugs, and self-harm.

Mr. Davis had three incidents of misconduct incidents in mid-June. The first incident involved Mr. Davis threatening a sergeant because he was upset about the amount of food on his Ramadan tray. The other two incidents involved Mr. Davis threatening another sergeant and trying to assault a custody officer by throwing a book through his cuff port. He received conduct reports for the incidents. Ms. Boren opined that Mr. Davis's mental health history and diagnosis weren't factors in his misconduct.

Toward the end of June, Ms. Boren met with Mr. Davis in response to his request for medication to treat his anxiety and depression. Ms. Boren told Mr. Davis that she didn't have the authority to prescribe or order medications. She

also told him that he would be seen to evaluate his symptoms and determine if any referrals were needed. Ms. Boren met with Mr. Davis on a different day at his cell front. Mr. Davis made no requests and Ms. Boren told him to submit a request form if he had any mental health needs.

*July 2017.* Ms. Boren prepared an administrative note documenting that Mr. Davis received a conduct report for attempted assault because a brown liquid substance was found in front of his cell. Ms. Boren noted that Mr. Davis's diagnosis, mental health history, and current status, his mental health was not a factor in the misconduct. The next day, Ms. Boren saw Mr. Davis at his cell front, and he had no requests.

A nurse treated Mr. Davis because he complained of a swollen hand and rash. The examining nurse said she couldn't assess Mr. Davis because he became verbally abusive toward her and threatened to "gun staff down." Custody staff witnessed this exchange.

*August 2017.* Ms. Boren assessed Mr. Davis's behavioral health during her weekly rounds. Mr. Davis indicated he wanted to be placed back on his depression medication so that he could leave the restricted housing unit. Ms. Boren again told him that she didn't have the authority to prescribe or order medication. She explained that he would continue to be seen during weekly rounds and monthly reviews unless he submitted a specific request.

The next day, Mr. Davis received another conduct report for attempted assault when a brown liquid substance with the odor of feces was found in front

of his cell. Ms. Mizgate noted that, given Mr. Davis's diagnosis, mental health history, and current status, his mental health wasn't a factor in the misconduct.

Mr. Davis got another conduct report four days later because he was unhappy with his kosher meal and threatened to throw bodily waste on custody officers if they didn't fix it. Ms. Boren opined that Mr. Davis's mental health wasn't a factor his misconduct. *D*uring two cell visits with Ms. Boren, Mr. Davis made no requests for mental health services.

*September 2017.* Ms. Boren assessed Mr. Davis's behavioral health at his cell front. He asked for some "busy work" and to be placed on the list for monthly individual therapy sessions. Ms. Boren told Mr. Davis to submit a request if he needed mental health treatment.

*October 2017.* Mr. Davis had an individual therapy session with Ms. Boren. He initially discussed the struggles he had with anxiety and depression, including his lack of energy and motivation. Mr. Davis also said that he had given an honest effort to trying to control his mental health needs without medication but didn't feel it was going well. They talked about Mr. Davis journaling his thoughts as well as using visualization and mediation for his symptoms. Because Mr. Davis hadn't completed the worksheets Ms. Boren had previously given him, he was encouraged to complete those as well. Ms. Boren noted that Mr. Davis was tearful and often seemed to be confused about his feelings. She told him she would continue to follow-up with him during weekly rounds and monthly individual sessions.

*November 2017.* Ms. Boren met with Mr. Davis four times on consecutive days. First, Mr. Davis told Ms. Boren he had been struggling and demanding help. Ms. Boren noted that Mr. Davis tended to engage in this pattern of behavior around the holidays and would use any means to hurt himself when he was angry and frustrated about his living conditions or felt he wasn't being treated fairly. He was placed on suicide monitoring because a small abrasion on his left wrist indicated that he may have tried to cut himself.

Second, Ms. Boren met with Mr. Davis, and noted he continued to be demanding and manipulative. He appeared to be frustrated and overwhelmed because he wasn't getting what he thought he deserved. Ms. Boren observed that he appeared to switch between intimidating and super nice behavior to gain control of his situation. She documented that he suffered more from personality disorder traits than anything else and his psychotic symptoms weren't significant at the time.

Third, when Ms. Boren met with Mr. Davis, he reported he felt better and acknowledged he was responsible for his own actions. Given his improved condition, his temporary mental health placement was discontinued. And fourth, Ms. Boren followed up with Mr. Davis and they discussed ways to change his plans and his behavior. She noted Mr. Davis's depression had improved and wasn't significant. He wasn't suicidal and was compliant with his treatment plan.

*December 2017.* Mr. Davis again refused a monthly cell visit. He reported that he felt fine and didn't need to be seen.

13

## II.   SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying" the evidence that "demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. at 255. The court won't "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003). Summary judgment isn't a substitute for a trial on the merits or a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Instead, the court's only task in ruling on a motion for summary judgment

is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." Payne v. Pauley, 337 F.3d at 770. If a reasonable factfinder could find in favor of the nonmoving party, summary judgment can't be granted. Id.

### III.   DISCUSSION

Mr. Davis's amended complaint asserts that the defendants denied him constitutionally adequate mental health care in violation of the Eighth Amendment. He contends that, after he was transferred to Westville in April 2015, the defendants discontinued his medication and refused to provide him with appropriate mental health treatment for his severe depression and anxiety. Mr. Davis says he asked for mental health counseling and to be placed back on his medication, but the defendants denied his requests. He says his mental health was deteriorating because he was hearing voices, having panic attacks, and had uncontrollable depression with constant thoughts of suicide. Mr. Davis claims that, without appropriate treatment, the defendants simply left him to "suffer."

The defendants say there are no genuine issues of material fact as to Mr. Davis's alleged inadequate mental health care claim. They contend the medical record and affidavits establish that Mr. Davis received constitutionally appropriate mental health care because he had access to a psychiatrist, psychologist, and mental health professionals, who consistently evaluated and responded to his mental health needs. The defendants point out that Mr. Davis

had a history of refusing mental health treatment, including many incidents of being noncompliant with taking prescribed medications. His medications were discontinued because he had a history of refusing to take his medications and trafficking drugs. The defendants further assert that Mr. Davis was provided with appropriate mental health treatment because he had access to weekly and individual therapy sessions.

Under the Eighth Amendment, inmates are entitled to adequate medical care. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To establish liability, a prisoner must satisfy both an objective and subjective component by showing: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to that medical need. Farmer v. Brennan, 511 U.S. 825, 834 (1994). A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005). Deliberate indifference means that the defendant "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." Board v. Farnham, 394 F.3d 469, 478 (7th Cir. 2005).

For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base

16

the decision on such a judgment." <u>Jackson v. Kotter</u>, 541 F.3d 688, 697 (7th Cir. 2008). An inmate's mere disagreement with medical professionals about the appropriate course of treatment does not establish deliberate indifference, nor does negligence or even medical malpractice. <u>Arnett v. Webster</u>, 658 F.3d 742, 751 (7th Cir. 2011).

*A. Dr. Barbara Eichman*

Mr. Davis asserts that Dr. Eichman knew he needed prescription medication, but she decided to discontinue it. He says he's been on medication for years and it has provided him with much needed relief from his anxiety and depressive symptoms. Mr. Davis claims Dr. Eichman's abrupt decision to discontinue his medication showed she was deliberately indifferent to his mental health needs and caused him unnecessary suffering.

The record in this case shows Dr. Eichman's care met constitutional standards. There is no evidence from which a reasonable fact finder could conclude that her decision to discontinue Mr. Davis's medications was inconsistent with sound professional judgment. Dr. Eichman was responsible for Mr. Davis's direct care during the period covered by this lawsuit. She diagnosed him with ASPD and noted that there is no specific medication to treat ASPD, though medications could be prescribed to treat symptoms, such as anxiety or depression, that are associated with ASPD.

Dr. Eichman exercised her professional judgment in treating Mr. Davis and diagnosed him with ASPD. She based her diagnosis on his mental health history, clinical presentation, and reported symptoms. Despite his history of

being noncompliant in taking medications and trafficking drugs in prison, Dr. Eichman prescribed trials of Prozac and Geodon, at Mr. Davis's request, in an effort to improve his symptoms. However, because Mr. Davis refused to take these trial medications, Dr. Eichman discontinued them because he was noncompliant and did not show any improvement. She also considered Mr. Davis's request for a clinical diagnosis of depression or anxiety, but in her professional judgment she determined there was no basis for changing his diagnosis or prescribing further medication. She concluded that Mr. Davis's history of noncompliance with his medications, altercations with custody staff, threatening behavior toward staff, threats of self-harm if others didn't comply with his wishes, manipulation, destruction of property, and overt violations of prison rules were consistent with a diagnosis of ASPD. Given the extensive mental health record detailing the personalized, professional mental health care Mr. Davis received from Dr. Eichman, no reasonable fact finder could find on this record that she was deliberately indifferent to his serious need for mental health treatment.

### B. Eddie Taylor

Mr. Davis argues that Dr. Taylor denied him medical treatment when he stopped his medication. He claims that Dr. Taylor failed to provide him with any treatment and he engaged in acts of self-harm as a result. Thus, Mr. Davis asserts that Dr. Taylor's refusal to provide him with mental health treatment showed he was deliberately indifferent to his serious mental health needs and caused him unnecessary suffering. *Id.*

The record in this case establishes that—to the extent he was involved in Mr. Davis's care at all—Dr. Taylor provided Mr. Davis with constitutionally adequate care. Dr. Taylor's role as the lead psychologist at Westville was primarily administrative. He oversaw the mental health program and mental health professionals, who provided direct care to Mr. Davis. Dr. Taylor didn't have authority to prescribe or order medication.

Dr. Taylor had a limited role in treating Mr. Davis and participated in only two incidents involving Mr. Davis's mental health care. First, he decided that Mr. Davis should remain on suicide watch after he had an altercation with custody officers about his request for a gluten free meal tray. Dr. Taylor also participated in a discussion with Dr. Eichman and Ms. Koehler about Mr. Davis's request for a specific diagnosis so that he could be prescribed medications and released from the segregated housing unit. Dr. Taylor's treatment was based on Mr. Davis's clinical presentation, observed behavior, and history of refusing treatment and medication, which he found to be consistent with a diagnosis of ASPD. Mr. Davis complains that Dr. Taylor denied him medical treatment when he stopped his medication, but Dr. Taylor didn't have the authority to prescribe or order medication. No reasonable fact finder could find on this record that Dr. Taylor was deliberately indifferent to his serious need for mental health treatment.

### C. Michelle Boren

Mr. Davis contends that Ms. Boren knew he needed mental health counseling but refused to provide it. He claims that each time she made rounds, he told her he needed help, but she would only provide him with information on

journaling. Thus, Mr. Davis asserts that Ms. Boren's refusal to provide him with the treatment he needed showed she was deliberately indifferent to his serious mental health needs and caused him unnecessary suffering.

The summary judgment record shows that Ms. Boren provided constitutionally appropriate care. Ms. Boren provided Mr. Davis with ample mental health counseling as she routinely met with him during her weekly rounds and monthly sessions. During her visits with Mr. Davis, she would frequently assess his behavioral health, review his treatment plan and goals, and discuss ways, including journaling techniques, he could use to address his anger. Ms. Boren also met with Mr. Davis for an individual therapy session during which they discussed his difficulties dealing with his anxiety and depression. She further observed that Mr. Davis suffered from ASPD and noted he was demanding, manipulative, frustrated, and overwhelmed when he was not able to get what he thought he deserved. Her treatment notes show that, at times, Mr. Davis would refuse to come out of his cell to meet with her and he made few requests for mental health care. Ms. Boren told Mr. Davis to submit a request form if he required mental health services. To the extent Mr. Davis might be claiming that Ms. Boren refused to provide him with medication, she didn't have the authority to prescribe or order medication. Given the role Ms. Boren played in Mr. Davis's care, no reasonable fact finder could find on this record that she was deliberately indifferent to Mr. Davis's need for mental health treatment.

## IV.   CONCLUSION

For the reasons, the court:

(1) GRANTS the defendants' motion for summary judgment (ECF 64), and

(2) DIRECTS the Clerk to enter judgment in favor of Defendants Eddie Taylor, Dr. Barbara Eichman, and Michelle Boren, and close this case.

SO ORDERED on September 21, 2020

s/ Robert L. Miller, Jr.
JUDGE
UNITED STATES DISTRICT COURT